# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
|                        ) | |
|           Plaintiff,        ) | |
|                        ) | |
| v.                                 ) | Case No.  06-10001 -01, -02-WEB |
|                        ) | |
| JAMES S. PHILLIPS, JR., and      ) | |
| ALICIA MORALES-PHILLIPS,      ) | |
|                        ) | |
|           Defendants.      ) | |

## Memorandum and Order

The defendants James Phillips, Jr. and Alicia Morales-Phillips were jointly charged in a 16-count Indictment with eight counts of making or using false documents on a matter within the jurisdiction of a United States agency, in violation of 18 U.S.C. § 1001 and 2, and eight counts of forging or falsely making documents prescribed by statute or regulation as evidence of authorized stay or employment in the United States, in violation of 18 U.S.C. § 1546(a) and 2.  The matter was tried to a jury on February 6-9, 2007.  At the close of the Governments' case, the defendants moved for judgment of acquittal pursuant to Fed.R.Crim.P. 29.  The court reserved decision on the motion and submitted the case to the jury, which found the defendants guilty on all counts.  The matter is now before the court on the defendants' renewed Motion for Judgment of Acquittal and for New Trial.  (Docs. 50, 55).  The Government has filed its response.  (Docs. 56, 57).  The court finds that further oral argument would not assist in deciding the issues presented.

I.   *Summary of Arguments*.

As to Counts 5 and 6 of the Indictment, the defendants each contend the evidence was insufficient to show they had anything to do with the altered date of Mr. Kramer's signature.  Doc. 50 at 3; Doc. 55 at 3.

With respect to the remaining counts relating to labor certifications (Cts. 1-4, 7-14), defendant James Phillips argues the circumstantial evidence failed to prove his involvement, knowledge or assistance in the forgery of any employer signatures: "There was simply no evidence from which the jurors could reasonably infer that Mr. Phillips in any way knew that Alicia Morales-Phillips was forging the signatures of employers or that he intentionally assisted with this practice in any way."  Doc. 50 at 5.  Pointing out that a person did not have to be an attorney to sign or to file the applications, defendant argues that allowing his conviction to stand would improperly assign criminal responsibility to him for the crimes of one of his employees.

With regard to Counts 15 and 16, both defendants argue the evidence failed to show they forged Ms. Solorzano's signature or acted knowingly and, additionally, failed to show that any such false writing was material.  *Id*. at 6-7; Doc. 55 at 3-4.

The defendants contend the evidence was insufficient as to Counts 1,2,9,10,11,12,15 and 16 because the Government relied upon photocopies of documents not certified or shown to be correct as required by Rules of Evidence 1005 and 902.  *Id*. at 7-8.  They further contend the evidence was insufficient on all counts that were based upon the handwritten ETA 750's filed April 30, 2001 (Counts 3,4,9,10,11, 12) because Ms. Burbridge did not compare the four handwritten documents submitted as part of each application, and so she did not know whether the documents admitted at trial were the same as others documents submitted as part of the applications.  Doc. 50 at 9; Doc.

55 at 8.

With respect to the charges under 18 U.S.C. § 1546(a), defendants argue the Government failed to prove that the ETA 750's or the petition for asylum were prescribed by law for entry into the United States or as evidence of authorized stay or employment in the United States.  Doc. 50 at 9; Doc. 55 at 9.  As for the counts under 18 U.S.C. § 1001, the defendants contend the Government failed to prove that the matters charged were within the executive branch of the Government, or that submitting documents to the Kansas or Missouri state labor agencies qualified as submission of the documents to the U.S. Government.  *Id*. at 10.  Finally, the defendants argue they should be granted a new trial for all of the foregoing reasons and because of errors or omissions in the court's instructions to the jury.  Doc. 50 at 11; Doc. 55 at 10-11.

II. *Standard on Motion for Judgment of Acquittal*.

On a motion for acquittal challenging the sufficiency of the evidence, the court must determine "whether, taking the evidence – both direct and circumstantial, together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find defendant guilty beyond a reasonable doubt."  *United States v. Montgomery*, 468 F.3d 715, 719 (10th Cir. 2006).  In doing so the court must consider the collective inferences to be drawn from the evidence as a whole.  *United States v. Vallejos*, 421 F.3d 1119, 1122 (10th Cir. 2005) (*citing United States v. Wilson*, 107 F.3d 774, 778 (10th Cir. 1997)).  Furthermore, "while the evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt."  *Vallejos*, 421 F.3d at 1122.  If the Government's proof meets this standard, the court must defer to the jury's verdict.  *Id*. (citations omitted).

3

III. *Summary of Evidence*.

Because the Government's case is largely circumstantial in nature, a rather extensive summary of the evidence is necessary to address the instant motions. Among other evidence, the Government presented testimony from Jane Burbridge, who was formerly the Program Manager of the State of Kansas Foreign Labor Certification Unit. Although she was a state employee, Burbridge's position was funded by the U.S. Department of Labor ("DOL"). She was trained by the DOL on how to administer the federal program for certification of alien employees and was obliged to follow DOL regulations. Her duties including accepting and reviewing Department of Labor "Applications for Alien Employment Certification" (also known as ETA 750's ) submitted by employers wishing to hire foreign workers. These DOL forms contained a portion for the applicant to fill in showing that an employer was willing to sponsor a foreign worker and a portion stating the qualifications of the foreign worker. When Ms. Burbridge provided ETA 750 forms to employers, she also gave them a set of instructions. The forms and the instructions were also available on a DOL internet web site. When Ms. Burbridge accepted the forms, she would stamp or write the date of receipt on them. When she worked on the forms, she would review them to see that all essential parts had been completed. If a form came in missing something critical, such as a signature, she would send the form back to be completed by whoever had sent it in. She testified that the form had to be signed by the employer or by someone with hiring authority. If a form appeared to be complete and if the employer provided proper documentation showing the available position had been advertised as required, Ms. Burbridge would send the form on to a regional office of the U.S. Department of Labor for its consideration. Ms. Burbridge testified that anyone could file the forms with her office, but if it was an attorney acting on behalf of an employer they had to complete a form

4

G-28 signed by both the employer and the attorney.

The itemized instructions for completing Form ETA-750 state that three completed forms 750 A and B (two originals and one copy) must be submitted, with the two original forms having the employer's signature on Form A and the alien's signature on Form B.  Govt. Exh. 101 at Part A, note.  The form contains a space for an employer to declare under penalty of perjury that all of the items in the form are true and correct, and "all copies of this form must bear the original signature of the employer or the employer's duly authorized representative with hiring authority." *Id*. at Item 24.  The instructions caution that false statements are subject to federal perjury and fraud penalties.  *Id*.  Another item in the instructions contains a more extensive warning that any employer or alien, or their agent or attorney, who in the labor certification application process knowingly and willfully falsifies, conceals or covers up by any trick a material fact, or who makes or uses a false writing or document, or who knowingly subscribes as true any false statement of material fact or who knowingly presents an application containing any such false statement, is subject to prosecution under 18 U.S.C. §§ 1001 and 1546.  *Id*. at Sec. F.  The instructions also state:

> Employers and aliens may have agents apply for labor certification on behalf. [sic] Each party (employer and/or alien) represented by an agent must sign a statement designating the agent and taking full responsibility for the accuracy of any representations made by the agent.  The authorization statements are in Parts A and B of the Application for Alien Employment Certification Form. * * *
>
> Employers and aliens may have attorneys represent them.  Each attorney must file a Notice of Appearance on Immigration and Naturalization Service Form G-28, naming the attorney's client(s).

*Id*. at Part B, item 1.

Ms. Burbridge testified about the effect of the LIFE Act, a federal law that allowed certain undocumented aliens to seek adjustment of their status to lawful permanent resident if they applied

by April 30, 2001 for labor certification pursuant to DOL regulations.  *See* 8 U.S.C. § 1255(i)(1)

She testified that her department received about 90 ETA 750's for labor certification in the year

2000, but due to the LIFE Act they received about 1,250 such forms in 2001.  Ms. Burbridge

testified that April 30, 2001, the deadline for submitting ETA 750's under the Life Act, was a hectic

day.  She testified that defendant Alicia Morales-Phillips came in that day with a stack of

applications.  Ms. Burbridge was busy at the time helping several aliens complete their forms, and

she told Ms. Morales that she would just collect the applications from her at that time if she wanted.

Ms. Morales indicated she wanted to sit and work on the forms.  Ms. Morales sat at a table in the

office for at least a couple of hours working on the applications.  Ms. Burbridge noticed that she

appeared to be writing on the documents.  At some point, Ms. Burbridge asked Ms. Morales if she

was an attorney; the defendant responded that she worked for her husband, James Phillips.

Eventually, Ms. Morales submitted a stack of approximately 10-20 ETA 750's to Ms. Burbridge.


At trial, there was specific evidence relating to four of the ETA 750's submitted by Ms.

Morales-Phillips on April 30, 2001.  All of the information filled in on these four ETA 750's was

hand-printed in blue ink.  *See* Govt. Exhs. 3-1; 9-1; 11-1,11-2.

Ms. Burbridge testified that her office would send out postcard notices to the agent listed on

the ETA 750 forms notifying them that the agency had received their paperwork.  On most of the

ETA 750's at issue in this case, the agent was designated as "James S. Phillips, Jr." of "Phillips and

Phillips Chtd. Law Offices" [or some variation thereof]  at 530 E. Central in Wichita, Ks.  Postcards

were thus mailed to Mr. Phillips and/or the Phillips law firm with notification that  a foreign labor

certification application for the employer and alien had been received.  Ms. Burbridge also talked

6

to defendant Jim Phillips on the phone on occasion, although she does not remember the details of those conversations.

It was several months before Ms. Burbridge began working on the applications, but at some point she noticed one of the forms submitted by Ms. Morales from April 30th relating to a job at Acme Foundry.  Govt. Exh. 3-1.  James S. Phillips, Jr. of Phillips and Phillips law office in Wichita was listed as the agent for the employer and the alien on this form.  Ms. Burbridge knew that another ETA 750 relating to Acme Foundry had been submitted by a different attorney group.  Ms. Burbridge obtained and compared these two forms and noted that although the jobs described were almost identical, the form submitted by Ms. Morales listed a much lower wage for the position.  Ms. Burbridge also compared the employer signatures (in the name of "Jason Zimmerman") on the two forms and noticed they did not match.  Ms. Burbridge subsequently wrote Mr. Zimmerman a letter with a copy of the application submitted by Ms. Morales-Phillips and asked if that was his signature and whether he was aware of the application being submitted on his behalf.  Def. Exh. 34.  On Govt. Exh. 3-1, the hand-printed matters included the name "Jason D. Zimmerman" in the blocks for the employer's signature.  The handwriting on Zimmerman's name appears similar to the handwriting below listing Phillips & Phillips Law Office and James S. Phillips, Jr. as the employer's agent.

At trial, the Government called Jason Zimmerman, the director of human resources at ACME Foundry.  Zimmerman testified that employee Ubaldo Nunez-Frausto had approached him at one time and asked if the company would assist him in getting his immigration status cleared up.  Zimmerman agreed and wrote a letter on Nunez' behalf and filled out a form (a Petition for Alien Worker) that Nunez gave him.  See Govt. Exh. 3-2.  Zimmerman said his actual signature appears on this form, Exh. 3-2.  Zimmerman testified that he had never seen Govt. Exh. 3-1, the application

for alien employment certification, and that the hand-written name in the signature block on that document was not his signature.  Zimmerman said he had never authorized the Phillips law firm to act as his agent.  Zimmerman testified he received the letter from Jane Burbridge inquiring about this form, and that he wrote back telling her it was definitely not his signature.

Another ETA 750 listing James Phillips as agent was filed with Ms. Burbridge's office on or about June 27, 2001.  Govt. Exh. 1-1.  This form listed Superior Frame Co. as the employer.  On Part A, in the space for the employer to sign to declare that the representations were true and correct, the name Brian Jennings appeared hand-printed in blue ink.  The same name was likewise hand-printed on the block where the employer apparently authorized an agent to act on its behalf.  The agent was identified in type-written script as James S. Phillips, Jr., with an address in Wichita, Ks. On Part B, there appeared a signature for alien Sergio DeJesus-Tellez in hand-printed blue ink.  The same appeared in the signature block below it allowing the alien to designate an agent, with James. S. Phillips, Jr. in Wichita apparently designated as the agent.  Various materials were attached to the form, including certified English translations documents notarized by Alicia Morales.

Ms. Burbridge's office received three more ETA-750's on or about July 10, 2001, listing James S. Phillips, Jr. of Wichita as the agent of employer Superior Frame Co.  Part A of the first of these forms contained apparent signatures of Brian Jennings, while Part B bore apparent signatures of alien Marcelo Garcia.  Govt. Exh. 1-2.  The second ETA 750 from July 10 was received for alien Raul Arellano.  Govt. Exh. 1-3.  A third ETA 750 dated July 10, 2001, was received for employer Superior Frame and alien Florencio Ruben.  Govt. Exh. 1-4.  The apparent signatures for Brian Jennings on Exhs. 1-2, 1-3 and 1-4, although illegible, appear to be nearly identical to one another. The Government presented the testimony of Brian Jennings, who stated that he had met with

defendant Alicia Morales-Phillips at a law office in Kansas City, Kansas, after some of his employees asked him to help them get legal status in the United States. He and his employees met with her two or three times and she said she thought she could help. Jennings signed some papers and had his company write checks to the Phillips firm for its services. He believed that Ms. Morales-Phillips was an attorney. Jennings testified that although he may have seen one of more of the ETA-750 documents at Morales-Phillips' office, none of the signatures on Exhs. 1-1, 1-2, 1-3, or 1-4 were his, and that he did not authorize the defendants or anyone else in the Phillips firm to sign his name.          Another ETA 750 from the Phillips law firm was sent to Ms. Burbridge's office by certified mail on November 1, 2002. *See* Govt. Exh. 5-2b. This form related to a job in Missouri. On or about November 12, 2002, Ms. Burbridge mailed the application back to the Phillips and Phillips law firm at its Great Bend, Ks. office, with directions to submit the form to the State of Missouri office rather than the Kansas office. Ms. Burbridge also sent a copy of the form and a letter to her counterpart in Missouri as a "heads up." The copy sent by Ms. Burbridge to the Missouri office shows the form was signed for employer LAD Enterprises by "A.J. Kramer," with Mr. Kramer's signature dated 8/15/02. Gail Graves, the State of Missouri Foreign Labor Certification Coordinator, testified that Govt. Exh. 5-1 was subsequently filed in her office on August 6, 2003. On this form, the original month and year were whited-out and written over, with the date of Mr. Kramer's signatures now appearing as "2/15/03" instead of "8/15/02". The Government presented the testimony of Lance Kramer, the son of A.J. Kramer, who testified that he formerly worked for LAD Enterprises, Inc., which was owned by his father. He testified that Jesus Ruiz had worked for his father's company. He also testified that although his father's signature on Govt. Exh. 5-1 appeared genuine, he could not have signed it on 2/15/03 as that form

represented, because his father had passed away on Christmas day of 2002. Govt. Exh. 5-4. He also testified that the last paycheck issued to the employee listed on the application, Jesus Ruiz, was dated December 12, 2002, and that Ruiz was no longer working for the company on 2/15/03 because the company was closed and out of business by that date.

Ms. Burbridge's office received two ETA 750's on October 17, 2001, listing the defendant James S. Phillips as agent for the employer Huffman, Inc. The forms were apparently signed by Keith Huffman, who was listed as the owner of the business. Govt. Exhs. 7-1, 7-2. The Government presented the testimony of Keith Huffman, who said he had been the operation manager for his father's business, Huffman, Inc. He testified that the aliens listed on these forms had been employees of the company and their job descriptions were accurate. He also testified that he had agreed to help one or both of these individuals get a labor certification, but that the signatures on Exhibits 7-1 and 7-2 were not his and he never authorized James S. Phillips, Jr. or the Phillips law firm to act as his agent and had never spoken to anyone at that firm.

As noted previously, on April 30, 2001, defendant Morales-Phillips submitted an ETA-750 to Ms. Burbridge for employer Cromer Consolidated Holdings, and listing James S. Phillips as the agent for the employer. Govt. Exh. 9-1. There were purported signatures on the form for "Erik Cromer," although the signatures were not really legible. Another ETA 750 listing Mr. Phillips as agent was received by Ms. Burbridge's office on "9-25-0" [sic], most likely in 2001. The employer on this form was also Cromer Consolidated Holdings, and it was apparently signed by owner Eric Cromer. Ms. Burbridge could not say if this exhibit was an original or a copy; she noted that Mr. Cromer's signatures appeared to be photocopied and then traced over in blue ink. Govt. Exh. 9-2. The signatures for Mr. Cromer on 9-1 and 9-2 appear similar to each other. On October 17, 2001,

Ms. Burbridge's office received two more ETA 750's listing James Phillips as agent and the employer as Cromer Consolidated Holdings. These forms likewise bore apparent signatures for Eric Cromer, Govt. Exhs. 9-3, 9-4, although the signatures were somewhat different than the ones on Exhibits 9-1 and 9-2. At trial, the Government presented testimony from Eric Cromer, the operator of Cromer Livestock, who testified that in 2001 some of his employees had asked him to come with them to a law firm in Wichita to find out about labor certification that would allow them to gain permanent status in the United States. Mr. Cromer agreed and subsequently met in Wichita with defendant Alicia Morales on or about March 30, 2001. He testified that Morales told them about a program for agricultural workers that would give them a kind of blanket exemption. Mr. Cromer testified that he believed Ms. Morales was an attorney. He testified that he provided job descriptions to Ms. Morales that the employees performed and signed an application for that program and gave Ms. Morales a check for $500. He said he was never asked to give authority for the Phillips law firm to sign his name to anything. He testified that the purported signatures for him on Govt. Exhs. 9-1, 9-2, 9-3 and 9-4 were not his and that he did not give anyone, including Ms. Morales or the Phillips law office, the authority to sign for him. He also testified that other information on the form about the nature of the work was inaccurate and that he would not have signed the document with that information.

Eric Cromer's brother, Kerry Cromer, testified that he employed Oscar Rios-Espinoza and Oscar's father, Manuel Rios, in connection with Cromer's business training quarter horses called Patty John Quarter Horses. Kerry Cromer testified that he never spoke to either of the defendants or anyone from the Phillips law firm, and he had no knowledge about the applications for foreign labor certification for his employees. He testified that the signatures in his name on Govt. Exhs. 11-

1 and 11-2 were not made by him and he did not authorize anyone to sign these for him.  *Id*. at 68.

He also testified that, contrary to the assertion on the forms, he never authorized James Phillips to

act as his attorney.

The Government presented testimony of Ms. Elpidia Solorzano, who testified that she met

with defendant Alicia Morales-Phillips in Garden City, Kansas, as part of an effort to get a work

permit for herself and her husband.  Ms. Solorzano gave defendant Morales-Phillips a check for

$2,000, and agreed to pay a total of $6,000 for the firm's assistance.  Sometime after their initial

meeting, Solorzano called Ms. Morales-Phillips and asked about the status of the permit.  The

defendant told her the paperwork had been filed.  Thereafter, Solorzano received documents in the

mail from a U.S. Citizenship and Immigration Office in Nebraska, including a rejected I-589

Application for Asylum in Ms. Solorzano's name.  Ms. Solorzano testified that she did not sign the

signature on the document that purported to be hers.  Govt. Exh. 15 at p.9.  The signature was dated

11/1/03, more than a year after she wrote the check to the Phillips firm.  She said she did not sign

any documents for the firm after she wrote that initial check.  Below Ms. Solorzano's purported

signature was a declaration and signature of the person preparing the form.  The preparer was listed

as James S. Phillips, Jr.  Ms. Solorzano said she never met with or talked to defendant James

Phillips.

Donald Phillips of the U.S. Bureau of Citizenship and Immigration Services testified that his

agency was authorized to receive various immigration forms, including the I-580 Application for

Asylum.  He testified that a check of records showed that an Application for Asylum was filed in

the name of Elpidia Solorzano on December 29, 2003, but was immediately rejected on December

30, 2003.  He testified that a rejected application such as this would be returned to the applicant with

12

a letter, or to their attorney if a proper G-28 Entry of Appearance had been submitted.

An ETA 750 listing James Phillips as agent was received by Ms. Burbridge's office on July 16, 2001.  Govt. Exh. 13-1.  This form listed Joe's Electric Repair of St. John's, Kansas, as the employer.  It was apparently signed by owner Joe Dodson on July 8, 2001.  Another ETA 750 listing James Phillips as agent was received by Ms. Burbridge's office on October 17, 2001.  Govt. Exh. 13-2.  This one also listed the employer as Joe's Electric Repair and bore the apparent signatures of Mr. Dodson.  The signatures on this form appear to match those on Exh. 13-1.  At trial, Joe Dodson, the owner of Joe's Electric Repair, testified that his actual signature appeared on the third page of Govt. Exh. 13-1, on a letter he wrote to Alicia Morales on behalf of his employee Roberto Reyes, but that what purported to be his signatures on the ETA 750's in Exhibits 13-1 and 13-2 were not his, and he never authorized either of the defendants to sign his name.

Phil Barbour, a criminal investigator with the U.S. Department of Labor, testified that on July 14, 2006, he and other agents executed a warrant for the arrest of defendant Alicia Morales-Phillips at her residence in Mesquite, Texas.  He testified that she waived her *Miranda* rights and agreed to talk to the agents.  Govt. Exh. 100.  Among other things, Barbour testified, the defendant said she was now separated from James Phillips, that the Phillips law firm was no longer in business, and that she had some records from the firm but could not consent to a search of them because they belonged to Mr. Phillips.  Barbour had the defendant review copies of the ETA-750's  referred to above, and had her mark on them to indicate whether she had signed the employer's name or had completed other information on the forms.  She wrote her name on the copies to indicate items that she had (or had not) signed or written on the original forms.  The copies on which Ms. Morales-Phillips marked were admitted as Exhibits 1-1a, 1-2a, 1-3a, et. cet [corresponding to Exhibits 1-1,

13

1-2, 1-3, et cet.].  Among other things, Barbour testified that Ms. Morales-Phillips admitted having written the employer's and alien's name in the respective signature boxes on Govt. Exh. 1-1.  As to Exhs. 1-2, 1-3 and 1-4, she said that Brian Jennings had signed those signature lines, but that she signed the aliens' signatures.  She admitted filling in the employer's name on the signature line of Exh. 3-1.  As to Exh. 5-1, she stated that Mr. Kramer had signed the form on 2/15/03.  Govt. Exh. 5-1a.  The defendant stated she was not sure if she had signed Mr. Huffman's name on Exh. 7-1, but that the signature on Exh. 7-2 looked like her writing.  Govt. Exhs. 7-1a, 7-2a.    The defendant denied having signed Eric Cromer's signature on Exhs. 9-1, 9-2, 9-3, or 11-1. She stated that the employer had signed one or more of these forms.  She admitted having filled in the hand-written name of the employer under some of the signatures, such as on Exh. 11-1.  She denied having signed the employer's name on Exh. 11-2.  She admitted having signed Mr. Dodson's name on Exh. 13-1, but said she was not certain sure if she had done so on 13-2.  She denied having signed Ms. Solorzano's name on Exh. 15-1.

According to the agent, the defendant said she had filled out these forms based on information she had received from the employers and the aliens.  As to the signatures that she admitting signing, she said she had always been given authorization from the employer or the alien to sign on their behalf.  She said she had been given authorization both orally and in writing, although she did not have any documentation to substantiate that claim.  The defendant also provided a hand-written statement in which she likewise admitted having signed some employer names and other information and submitting the forms to the federal government, but again claiming she had authority from the person to do so.  Govt. Exh. 105.

The Government also presented the testimony of Odelia  Bryer, who worked at the Phillips

law firm in Wichita from March 2002 to January 2004.  Ms. Breyer testified that based on her

employment experience she was familiar with and could identify the handwriting and signatures of

the defendants.  Bryer testified that the handwriting in the employer signature block on Exh. 1-1

looked like that of Ms. Morales-Phillips.  As to the employer signatures in Exhs. 1-2, 1-3, and 1-4

Bryer said she had seen Morales-Phillips use that type of signature to sign Jim Phillips' name to

documents and that it appeared to be her writing.  She also said the writing in the signature blocks

of the employers in Exhs. 3-1, 7-1, 7-2, 9-3, 9-4, 11-1, 13-1, and 13-2 appeared to be the

handwriting of Alicia Morales-Phillips.  Ms. Bryer testified that the printed name and signature of

"Elpidia Solozano" on Exh. 15-1 appeared to be defendant Jim Phillips' handwriting, as did the

signature for James Phillips below it.  Ms. Bryer also testified that James Phillips had a serious car

wreck in January of 2003 and was hospitalized and out of the office frequently until approximately

April of 2003.

    IV.  *Discussion*.

    A.  *Sufficiency of Evidence - Falsely Made Documents.*.

    The defendants contend the evidence was insufficient to show that either of them altered the

date of Mr. Kramer's signature on the application cited in Counts 5 and 6.  They correctly point out

there was no direct proof relating to the alteration.  Defendants also challenge whether the evidence

was sufficient to show their participation in the other instances of allegedly forged signatures.

    The evidence would allow a reasonable jury to conclude that Ms. Morales-Phillips engaged

in an extensive pattern of forging employer signatures on the ETA 750's referred to in the

indictment.  Not only was there abundant circumstantial evidence of this fact, there was testimony

of a former employee that the handwriting on several "employer"signatures was that of Ms.

15

Morales-Phillips, and the defendant admitted after being arrested that she had written some of the signatures. The defendant apparently claimed she had authority to do so, but the evidence at trial refuted any such claim. A jury could reasonably infer from the evidence that defendant Morales-Phillips also altered the date on the A.J. Kramer application, or aided and abetted in its alteration, as part of the same course of conduct in which she falsely represented that the employer had signed various applications. As to Counts 5 and 6, the evidence showed that after Ms. Burbridge sent the original form back to the Phillips law firm, the date was altered and the form was submitted to the Missouri office. The evidence showed that Ms. Morales-Phillips was regularly engaged at the Phillips' law firm in the preparation and submission of these forms, and her knowledge and fraudulent intent are amply demonstrated by evidence of her conduct in knowingly forging and falsely using signatures on a number of other applications. Taken as a whole, the circumstantial evidence would allow a reasonable jury to find that she knowingly committed or aided and abetted in the acts charged in the indictment, including the alteration of the date on the A.J. Kramer forms.

The Government's evidence against defendant James Phillips presents a closer question. The only specific evidence of his participation in the making of a false writing came from former employee Odelia Bryer, who gave her opinion that the hand-printed name of Elpidia Solorzano on the applicant signature line in Exh. 15-1 (the subject of Counts 15 and 16) appeared to be Jim Phillips' handwriting. She also identified the defendant's signature just below Ms. Solorzano's purported signature, in a provision where the defendant, as the preparer of the form, ostensibly adopted a declaration stating in part that "she [the applicant] signed the application in my presence." Ms. Solorzano testified that it was not her signature on the application. The Government also presented evidence, albeit circumstantial, of Mr. Phillips' knowledge of and assistance in other acts

16

of making or using false writings.  Among other things, the Government presented evidence that the defendant was married to Ms. Morales-Phillips and was working with her during the same period the forged applications were being made and submitted, that he was the only lawyer in the Phillips' law offices, that Ms. Morales-Phillips was regularly engaged in the preparation of these forms,  that Ms. Morales-Phillips used the Phillips law offices to meet with employers and aliens who were seeking certification, that this work was generating payments to the law firm from employers, that Ms. Morales-Phillips informed Ms. Burbridge that her work on the ETA 750's was being done for her husband James Phillips, that James Phillips and/or the Phillips law firm were listed as the representatives of the employers on these forms, and that on account of Mr. Phillips being so listed the Kansas foreign labor office notified him by mail of the filing of the applications and Ms. Burbridge spoke to him by telephone on occasion.

In reviewing circumstantial evidence such as this, it is not the court's function to second-guess the fact-finding decisions of the jury.  *United States v. Michel*, 446 F.3d 1122, 1127 (10th Cir. 2006).  At the same time, a jury "will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility."  *Id*.  After much consideration, the court concludes the jury's verdict of Mr. Phillips' guilt was the product of rational inferences based upon evidence rather than speculation.  Taking the evidence as a whole and viewing it in the light most favorable to the Government, a jury could rationally infer that Mr. Phillips was aware of Ms. Morales-Phillips' ongoing practice of forging employer signatures, particularly in view of evidence that he employed a similar technique on Ms. Solorzano's application for asylum. *Cf. United States v. Powell*, 164 Fed.Appx. 720, 2006 WL 165005 (10th Cir. 2006) (circumstantial evidence supported inference of knowledge).  The evidence showed there was some involvement by both defendants

17

relating to Ms. Solorzano, and it would be reasonable to infer that both defendants were aware Mr. Phillips signed that application rather than Ms. Solorzano. A reasonable jury could also find that Mr. Phillips aided and abetted Ms. Morales-Phillips in carrying out the other acts charged by providing such assistance as office space and allowing the use of his name as the attorney-agent, with the knowledge and understanding that Ms. Morales-Phillips was signing the employer's name on these applications. It is contrary to common practice and common sense to suggest that an attorney would be unaware of what was going on in these circumstances, and the jury was entitled to draw an inference of knowledge and assistance by Mr. Phillips. *Cf. United States v. Vallejos*, 421 F.3d 1119, 1122 (10th Cir. 2005) (evidence need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt). It is again worth noting that the employers who testified at trial denied having engaged Mr. Phillips to act as their agent or attorney and denied having given him or anyone else the authority to sign their signatures. *Cf. United States v. Rodriguez*, 812 F.2d 414, 416 (8th Cir. 1987) (circumstantial evidence allowed inference of aiding and abetting in forgery); *United States v. Smith*, 133 F.3d 737, 743 (10th Cir. 1997) (circumstantial evidence showed defendant willfully associated himself with fraudulent scheme and acted to further scheme). Despite the fact that he had never met with them, Mr. Phillips was listed as the employers' agent, and notice of the filing of the applications was sent to him. Under the evidence presented, the jury drew a permissible inference that he was a willing participant in a joint scheme to use forged signatures on the labor certification applications and the application for asylum. And as to Counts 5 and 6 of the Indictment, the chain of circumstances would allow the jury to find that the defendants either made the alteration or aided and abetted in the alteration as part of the same course of deceptive conduct shown on the other counts.

18

The court also rejects the defendants' claims that the Government failed to show that the false statements or entries in the documents were "material" within the meaning of § 1001(a)(3). A statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decision making body to which it was addressed." *See Kungys v. United States*, 485 U.S. 759, 770 (1988). The court agrees with the Government that the jury had sufficient evidence to make a finding of materiality. Aside from the self-evident importance of the employer's signature on an application for labor certification, there was substantial trial testimony about the importance of the signature as representing the employer's certification of the facts in the application, as well as evidence from the documents themselves showing that the signature was material to the DOL's action on the application. The same is true of Ms. Solorzano's purported signature on the Application for Asylum in Count 15.

    B. *Claims of Improper Copies*.

The defendants complain that the Government failed to produce the original applications that formed the basis of Counts 1 & 2, 9 & 10, 11 & 12, and 15 & 16. The use of copies on these counts, however, does not constitute grounds for judgment of acquittal or for new trial. As the Government points out, Rule 1003 provides that a duplicate is admissible to the same extent as an original unless a genuine issue is raised as to the authenticity of the original or under the circumstances it would be unfair to admit the duplicate in lieu of the original. The evidence established that the copies of labor certification applications admitted at trial were photocopies that reliably and accurately reflected the contents of the original documents submitted to the agency. *Cf.* Fed.R.Evid. 901 (authentication is satisfied by evidence sufficient to show that the matter is what its proponent claims). There was uncontroverted circumstantial evidence establishing that the originals were

submitted to Ms. Burbridge's office by one or both of the defendants, and that the contents of the original documents remained unchanged from the time they were submitted until Ms. Burbridge or her assistant retrieved them from the agency files and made photocopies of them and until they were admitted at trial.[1]  The copies bear the date stamp placed on them by Ms. Burbridge or her assistant. Some copies were provided to Agent Kilcoyne and some may have been later forwarded to the DOL, but there is no evidence raising any doubt about whether the copies admitted at trial accurately reflected the contents of the original applications.  There was substantial circumstantial evidence corroborating the accuracy of these copies, including the testimony of Ms. Burbridge and other witnesses, the similarity of these copies to the contents of original applications produced on other counts, and Ms. Morales-Phillips' own admissions when interviewed by agents.  No genuine issue has been raised as to the authenticity of these documents, and the court finds no unfairness in their admission.  Additionally, the copies qualify for admission either under Rule 1004 or 1005.  Rule 1004 provides that if an original cannot be obtained by any available judicial process, then other evidence of the contents of the writing is admissible.  Rule 1005 provides in part that the contents of a document authorized to be filed and actually filed may be proved by copy certified to be correct under Rule 902 or testified to be correct by a witness who compared it to the original, but "[i]f a copy which complies with the foregoing cannot be obtained by the exercise of reasonable diligence,

---

[1] The DOL regulations required the submission of "two originals and a copy" of the ETA 750, and there was evidence that Ms. Burbridge required submission of an additional copy in her office.  To the extent any of the documents in question may have been copies that were submitted to the agency by the defendants, the court believes such documents would be considered "originals" under Fed.R.Evid. 1001(3), which states that an original of a writing includes a writing itself "or any counterpart intended to have the same effect by a person executing or issuing it."  This suggests that copies of the application submitted to the agency for its action would be considered original documents.

then other evidence of the contents may be given." Although Ms. Burbridge testified that she thought the originals sent to the DOL "could probably" be retrieved, she also stated that "it might take a while." Additionally, the Assistant U.S. Attorney handling the case represented that "we've tried and there's just no way that we can get the original back" from the Dallas office where the originals were sent. Based on this evidence and representation, the court concluded that as of the time of trial the originals were either lost or not obtainable through the exercise of reasonable diligence or available judicial process. There was no suggestion or evidence of bad faith on the part of the Government in this regard, and there is no evidence casting any doubt on the authenticity or accuracy of the photocopies. Accordingly, the court finds they were properly admitted.

The court likewise rejects defendants' claim that the admission of hand-written copies on Counts 3 & 4, 9 & 10, and 11 & 12 merits judgment of acquittal or new trial. The defendants cite no authority for their argument that the hand-written copies made by Ms. Morales-Phillips should not have been admitted. Nor have they shown how Ms. Burbridge's requirement for an extra copy of the applications requires a judgment of acquittal. The evidence showed that all of the hand-written copies admitted at trial were made by defendant Morales-Phillips and were submitted by her as part of an ETA 750 application.

C. _Section 1546(a) Counts – Third Essential Element_.

The defendants claim the Government failed to show that the ETA 750's or the Petition for Asylum were documents "prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States." *See* 18 U.S.C. § 1546(a). This argument is based on the first paragraph of § 1546(a), which applies to "any immigrant or nonimmigrant visa, permit, border crossing guard, alien registration receipt card, *or other document prescribed by*

21

*statute or regulation for entry into or as evidence of authorized stay or employment in the United States*, ..." [emphasis added]. The court notes that this argument presents a substantial question, but the Government's response fails to fully address it. Although the Government correctly points out there was testimony showing the documents at issue were "prescribed by statute or regulation," it does not address the whether they otherwise fall within the category of documents covered by the first paragraph of § 1546(a) – that is, documents "for entry" or "as evidence of authorized stay or employment."[2]  Doc. 57 at 10-11.

To be sure, the purpose of completing applications such as these is to obtain documents which grant or show approval to enter or work in the United States, but it is not a foregone conclusion that Congress had in mind *applications* of this type in the first paragraph of § 1546(a). The fourth paragraph of § 1546(a), by contrast, specifically singles out and prohibits the making of any false statement of material fact while under oath "*in any application* ... or other document required by the immigration laws or regulations prescribed thereunder, ..."

In *United States v. Ryan-Webster*, 353 F.3d 353 (4th Cir. 2003), a panel of the Fourth Circuit concluded by a 2-to-1 majority that an ETA 750 application for labor certification qualified as an "other document" under the first paragraph of § 1546(a). It noted that by statute and regulation, an immigrant generally cannot be admitted into the United States without a valid immigrant visa or passport,  8 U.S.C. § 1181(a), and an employment-based visa, in turn, generally may not be issued without a Labor Certification by the DOL, which requires a valid application.  8 U.S.C. §

_____

[2] The Government's response lists the essential elements for a charge under the fourth paragraph of § 1546(a) for making a false statement on an immigration form. Doc. 57 at 3-4. But the defendants were charged under the language in the first paragraph of § 1546(a) pertaining to documents for entry or as evidence of authorized stay or employment.

1182(a)(5).  As a prerequisite to obtaining a work visa, then, *Ryan-Webster* found that an application for labor certification qualified as an "other document" prescribed by statute and regulation "for entry into the United States."  The *Ryan-Webster* court noted that although an application, standing alone, would not authorize entry, Congress had previously amended § 1546(a) to expand its reach beyond those documents that are specifically *required* for entry into the U.S.  *See Ryan-Webster*, 353 F.3d at 361-63.  As the dissent characterized it, the ETA 750 applications do not themselves allow entry in to the country, but they are "part of one of the avenues through which an immigrant might gain the right to lawfully 'enter' the country."  *Ryan-Webster*,  353 F.3d at 364 (Williams, J., dissenting).  The dissent went on to point out, however, that other paragraphs in § 1546(a) specifically refer to "applications" or "other documents required by the immigration laws," which the dissenting judge cited as support for the conclusion that a labor certification application is excluded from the scope of the first paragraph.

Although a contrary interpretation of § 1546(a) can be made,  the majority in *Ryan-Webster* represents the only authority found by the court on this issue, and the court will follow the reasoning of that case.  Congress clearly intended in § 1546(a) to proscribe all types of forgery and fraud in connection with immigration documents that could be used to gain entry or as evidence of authority to stay or work in the U.S.  Construing the terms of the statute in accordance with Congressional purpose favors a conclusion that the ETA 750's and the Petition for Asylum are covered by the statutory prohibition.  Falsely made applications of this type can be ultimately used as a means to gain unlawful entry or to support an improper claim for authorization to stay or work in the United States, and as critical steps toward these objectives they can properly be considered documents "for

entry" or "as evidence of authorized stay or employment."[3]    Accordingly, the court rejects the defendants' motion for judgment of acquittal or new trial on the § 1546(a) counts.

D. *Section 1001 Counts - Essential Elements*.

Defendants next contend the Government failed to meet its burden on all counts under § 1001 because it failed to show that the matter involved was within the jurisdiction of the executive branch of the U.S. Government, and it also failed to show that submission of the applications to either the Kansas or Missouri Departments of Labor constituted submission of the documents to the executive branch of the U.S. Government.

The testimony of Ms. Burbridge and Ms. Graves was sufficient to show that the submission of the ETA 750 applications to their respective offices involved matters within the jurisdiction of the United States Department of Labor, an executive agency of the U.S. Government.    *Cf. United States v. Wright*, 988 F.2d 1036, (10th Cir. 1993) ("jurisdiction" in this statute is to be defined broadly;  agency has jurisdiction when it has power to exercise authority in a particular situation). The evidence showed that the documents were made or used on a matter within the jurisdiction of the federal agency, notwithstanding that they were initially submitted to a state agency operating under the supervision of the DOL.  *Cf. United States v. Wolf*, 645 F.2d 23, (10th Cir. 1981) (well settled that the false statement need not be made directly to a federal agency to sustain a section 1001 conviction); *Wright*, 988 F.2d at 1039 (state agency's use of federal funds, standing alone, is

---

[3]  As the court understands the law (and the testimony at trial), certain aliens unlawfully in the country who were the beneficiary of an application for labor certification filed by April 30, 2001, could apply for adjustment of their status to that of lawful permanent resident, and could remain in the country while any such application was pending.  *See*  8 U.S.C. § 1255(I).  With respect to the ETA 750's filed by the April 30 deadline, then, such applications would seem to constitute evidence of authorized stay in the United States.

generally sufficient to establish jurisdiction under section 1001).  The evidence showed that the ETA 750's were Department of Labor forms used to implement DOL programs for certification of foreign labor.  Ms. Burbridge and Ms. Graves, although they were state employees, operated under what was essentially an agency arrangement with the DOL, pursuant to which their positions were funded by DOL, they were trained by DOL, they helped to administer a DOL program, they were bound by DOL regulations, and they accepted and reviewed these applications on behalf of DOL.  If the applications appeared to be complete, they were forwarded on to the DOL.  It would be hard to conceive of a matter more closely connected to the jurisdiction of a federal agency.  And given the broad reach of § 1001 and the relationship pursuant to which the Kansas and Missouri labor agencies acted on behalf of DOL and under its directives, a reasonable jury could find that the Government met its burden of showing the essential elements of the § 1001 counts.  *Cf. United States v. Ramirez*, 420 F.3d 134, 142-43 (2nd Cir. 2005) (finding for venue purposes that offense began upon submission of documents to state agency and continued until they reached federal agency).

      E.  *Motion for New Trial*.

      Rule 33 provides in part that upon a defendant's motion the court may grant a new trial "if the interest of justice so requires."  A motion for a new trial is not regarded with favor and is only issued with great caution.  *United States v. Trujillo*, 136 F.3d 1388, 1394 (10th Cir.1998).

      The defendants first complain the court failed to instruct the jury that the term "forge" required proof of an intent to deceive or defraud.  *See* Instruction No. 19.  The court finds no basis for new trial in this argument.  The particular provision of § 1001 under which the defendants were charged contains no express requirement of an intent to deceive; it applies to anyone who knowingly and willfully makes or uses a false writing or document.  *See*  18 U.S.C. § 1001(a)(3).  Although

there is some disagreement in the case law, most courts have held that section 1001 does not require proof of evil intent or an intent to deceive, but only that a false writing was made or used deliberately and with knowledge of the falsity. *See United States v. Russo*, 202 F.3d 283 (Table), 2000 WL 14298 (10th Cir. 2000); *United States v. Gonsalves*, 435 F.3d 64 (1st Cir. 2006) (Section 1001 does not require intent to deceive; willfulness merely means that the defendant knew the statement was false). *See also United States v. Polar*, 369 F.3d 1248 (11th Cir. 2004) (Section 1546(a) contains no scienter requirement except that the defendant acted knowingly). As such, the court's instruction to the jury may have actually required a greater showing than necessary by defining "forge" as "to make a writing that falsely purports to be the writing of another person," because that definition arguably implied an intent-to-deceive requirement. *Cf. United States v. Hunt*, 456 F.3d 1255, 1260 (10th Cir. 2006). At any rate, the instruction does not warrant a new trial.

Defendants next complain that the court's Instruction No. 19 erroneously allowed conviction under § 1001 for submission of documents to a state rather than a federal agency. Based on the evidence showing the relationship between the state agencies and the DOL, however, the court rejects this as a basis for new trial. The evidence showed the arrangement whereby the state agency accepted documents under the jurisdiction of DOL, and on its behalf, and then forwarded them to the federal agency. Case law provides that liability can attach under § 1001 under such arrangements, and the defendants submitted no alternative instruction to explain the scope of that liability.

Defendants next reassert their arguments regarding the admission into evidence of copies rather than originals, but the court rejects those arguments for the reasons previously stated. The court likewise finds no basis for new trial in the jury instruction on reasonable doubt. The

26

instruction given by the court is a Tenth Circuit pattern instruction and has been previously approved by decisions of that court.   And finally, the court rejects defendants' claim that the court failed to ensure a unanimous verdict on each count.   The court instructed the jury on the necessity of a unanimous verdict and included language stating that "[w]here a count of the Indictment alleges multiple acts, you must unanimously agree upon which act was committed."   The court's recollection is that all counsel at the instruction conference agreed upon this language.   At any rate, the court concludes the jury was adequately instructed and understood the requirement of a unanimous verdict.

In sum, the court finds no grounds for granting a new trial or for a judgment of acquittal.

V.  _Conclusion_.

Defendants' Motions for Judgment of Acquittal or For New Trial (Docs. 50 & 55) are DENIED.  IT IS SO ORDERED this __30th__ Day of April, 2007, at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge

27